UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
                              :
MARIA PEREZ                   :
                              :
v.                            : CIV. NO. 3:13CV868 (HBF)
                              :
CAROLYN W. COLVIN, ACTING     :
COMMISSIONER, SOCIAL SECURITY :
ADMINISTRATION                :
                              :
```

## RECOMMENDED RULING ON CROSS MOTIONS

Plaintiff Maria Perez brings this action pursuant to 42 U.S.C. §405(g), seeking review of a final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Act, 42 U.S.C. §401 <u>et seq</u>. and Title XVI Supplemental Security Income ("SSI"). Plaintiff has moved to reverse the Commissioner's decision or, in the alternative, to remand the case for a rehearing, while the Commissioner has moved to affirm.

For the reasons set forth below, plaintiff's Motion for Order Reversing the Decision of the Commissioner [**Doc. #12**] is **DENIED**. Defendant's Motion for an Order Affirming the Decision of the Commissioner [**Doc. #15]** is **GRANTED.**

### I.  ADMINISTRATIVE PROCEEDINGS

The procedural history of this case is not disputed. Plaintiff filed an application for SSI and DIB on August 31, 2010, alleging disability as of January 1, 2010. [Certified

Transcript of the Record, Compiled on July 27, 2013, (hereinafter "Tr.") 145, 147]. Her claim was denied initially and upon reconsideration [Tr. 143-46; 154-56]. The SSI Title XVI application was denied on September 7, 2010, because plaintiff's income precluded benefits. [Tr. 149-52; 162-64]. The DIB Title II application was denied initially on November 23, 2010, and upon reconsideration on April 25, 2011. [Tr. 52, 72-75, 61]. Plaintiff filed a new application for SSI on November 29, 2010. [Tr. 172-80]. Plaintiff requested a timely hearing before an ALJ on June 17, 2011. [Tr. 157]. On May 16, 2012, Administrative Law Judge William J. Dolan held a hearing at which plaintiff appeared with counsel. [Tr. 80, 25-51; 80-81]. Vocational Expert ("VE"), Courtney Olds testified at the hearing. [Tr. 49-50]. A Spanish language interpreter, Robert Coletti, was present at the hearing. [Tr. 27]. On March 15, 2012, the ALJ found that plaintiff was not disabled, and denied her claims. [Tr. 7-24]. Plaintiff filed a timely request for review of the hearing decision on June 13, 2012. [Tr. 6]. On June 4, 2013, the Appeals Council denied review, thereby rendering ALJ Dolan's decision the final decision of the Commissioner. [Tr. 1-5]. The case is now ripe for review under 42 U.S.C. §405(g).

Plaintiff, represented by counsel, timely filed this action for review and moves to reverse the Commissioner's decision.

## II. STANDARD OF REVIEW

The scope of review of a social security disability determination involves two levels of inquiry. The court must

2

first decide whether the Commissioner applied the correct legal principles in making the determination. Next, the court must decide whether the determination is supported by substantial evidence. Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971); Yancey v. Apfel, 145 F.3d 106, 110 (2d Cir. 1998). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. Gonzales v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977). The court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993). The court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. In reviewing an ALJ's decision, the court considers the entire administrative record. Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). The court's responsibility is to ensure that a claim has been fairly evaluated. Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983).

Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold the ALJ's decision "creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Schaal v. Apfel, 134 F.3d 496, 504

3

(2d Cir. 1987). To enable a reviewing court to decide whether the determination is supported by substantial evidence, the ALJ must set forth the crucial factors in any determination with sufficient specificity. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). Thus, although the ALJ is free to accept or reject the testimony of any witness, a finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible review of the record. Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988). Moreover, when a finding is potentially dispositive on the issue of disability, there must be enough discussion to enable a reviewing court to determine whether substantial evidence exists to support that finding. Peoples v. Shalala, No. 92 CV 4113, 1994 WL 621922, at *4 (N.D. Ill. 1994); see generally Ferraris, 728 F.2d at 587.

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. 42 U.S.C. §423(a)(1). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). The SSA has promulgated regulations prescribing a five step analysis for evaluating disability claims. In essence, ifthe Commissioner determines "(1) that the claimant is not working, (2) that he has a "severe impairment," (3) that the impairment is not one [listed

in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); see also Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); 20 C.F.R. §§404.1520(b-f), 416.920(b-f).

The burden of proving initial entitlement to disability benefits is on the claimant. Aubeuf v. Schweiker, 649 F.2d 107, 111 (2d Cir. 1981). The claimant satisfies this burden by showing that an impairment prevents return to prior employment. Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983). The burden then shifts to the Commissioner, who must show that the claimant is capable of performing another job that exists in substantial numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

### III. VOCATIONAL PROFILE

Plaintiff was born on May 18, 1956, and was fifty-three years old on the date of alleged onset of her disability, January 1, 2010. [Tr. 145]. Plaintiff was born in Puerto Rico and moved to the continental United States in 1968. [Tr. 29]. She completed the ninth grade and did not complete a GED. [Tr. 30]. Plaintiff's past relevant employment was as an assembler for the Holo-Krome Company. [Tr. 31]. She was initially hired in 1997/1998 through

Job Pro Temporary Services as an assembler.[1] In 1999, she was offered a full-time position with Holo-Krome Company. [Tr. 32]. Her employment ended when the company relocated to Texas. Her last day of employment was November 20, 2009. [Tr. 30]. She collected unemployment insurance benefits until November 19, 2011. [Tr. 30].

Plaintiff is insured for the DIB Title II program through December 31, 2013. [Tr. 12].

### IV. Medical History

**A.** *Medical Records*

#### 1. Vision Eye Care

Plaintiff was seen for a vision examination on February 20, 2010. [Tr. 260-65]. On her intake form she stated she had a history of diabetes, and arthritis muscle/joint pain. [Tr. 265]. She stated she watched television, used a computer, read and cooked. [Tr. 265]. Plaintiff uses corrective lenses.

#### 2. Hartford Hospital 2009

Plaintiff was seen for routine follow-up care at Hartford Hospital/The Institute of Living on February 25, July 8, August 12, 21, 2009, [Tr. 278-79; 282-85;292-95]. Plaintiff did not

---

1 Plaintiff's brief states that she began her employment in 1998 at the Holo-Krome Company. Plaintiff also states that she worked for the company beginning in 1997. [Tr. 198, 241, 243, 248, 251].

show for her January 20 and November 12, 2009 appointments. [Tr. 284, 278].  Treatment notes from February 25, 2009, state that plaintiff presented complaining of body aches, nausea and decreased appetite. The examiner noted it appeared plaintiff had beginning symptoms of viral illness—"recommend fluids, Tylenol, rest." The examiner noted that plaintiff's diabetes appeared to be in good control and her hyperlipidemia was also controlled on medication. [Tr. 284-85]. Treatment notes from July 8, 2009, state plaintiff's diabetes and hyperlipidemia are controlled with medication. Stockings were ordered to treat plaintiff's varicose veins. "General alert, oriented NAD."  [282-83]. In treatment notes dated August 12, 2009, plaintiff complained of diabetes, history of gastritis, diverticulitis, hyperlipidemia, history hysterectomy 1990, obesity and varicose veins.[2] Edema is noted in her left leg. GERD symptoms controlled with Prilosec OTC, hyperlipidemia controlled with a statin, support stockings were advised for varicose veins, diabetes managed with medications. [Tr. 295].

### 3.  **Hartford Hospital 2010**

Plaintiff was seen at Hartford Hospital/The Institute for Living for routine follow-up care on January 21, April 19, August 25, November 2, and December 8, 2010. [Tr. 276-77; 280-81; 286-

---

2 Portions of this handwritten record are illegible. [Tr. 279].

87; 288-89; 290-91].  Treatment notes from January 21, 2010,
state plaintiff was seen complaining of left leg pain "numbness
in feet and pain in lower leg, occ[asional] swelling . . .hurts
to stand for long time," diabetes, and hyperlipidemia.
"Financial issues-laid off from job end of November . . . ." [Tr.
280]. "Generally alert, oriented, tearful." [Tr. 280]. The
examiner noted that plaintiff's diabetes was "probably
uncontrolled" due to medication noncompliance due to financial
circumstances. "Restart daily dose of meds." Similarly, the
examiner noted that plaintiff would restart a statin for
hyperlipidemia. An x-ray was ordered for the left foot swelling
and numbness with a venous Doppler and reflux study of the left
leg. [Tr. 281].  Treatment notes from April 19, 2010, state that
plaintiff complains of persistent knee swelling with pain which
has been treated with fluid removal, injection, physical therapy
and elastic support. [Tr. 286-87]. "Concerned about prolonged
standing if she returns to work. Still some swelling at knee."
[Tr. 286]. "Encourage weight loss." [Tr. 287].  It was noted that
plaintiff was treating her diabetes with Glipizide ER and
Avandia, "but not compliant [with] meds [due to] financial
issues. Did not bring glucometer readings." [Tr. 286]. "Appears
improved control." [Tr. 287].  Plaintiff was compliant with
taking prescribed statins for hyperlipidemia. The APRN noted that
plaintiff's weight was stable at 203 pounds and she was generally

alert, oriented, NAD.  [TR. 286]. A note to the file on April 27, 2010, states that plaintiff was "now compliant with meds" for her diabetes and hyperlipidemia.  [Tr. 287]. Treatment notes from August 25, 2010, state plaintiff is complaining of persistent pain to her right leg with swelling and is taking over-the-counter Motrin for pain. [Tr. 289]. She will follow up with Dr. Czarnecki. The APRN noted that plaintiff was complaint with her medication to control her diabetes and hyperlipidemia. [Tr. 288]. It was also noted that plaintiff weighed 200 pounds, losing three pounds since her last exam. [Tr. 288]. The APRN noted that plaintiff was generally alert and oriented. [Tr. 288].

Plaintiff was admitted to the cardiac floor of Harford Hospital on August 26, 2010, for cardiac monitoring. On admission to the emergency department, she reported that she started taking Metabolite the previous day to lose weight. [Tr. 302]. An acute MI was ruled out and plaintiff was started on a Cardizem drip. On the second day of hospitalization she converted back to sinus rhythm. An echocardiogram and CTA ruled out pulmonary embolism or intra-cardiac abnormality. [Tr. 296-98; 299-301].  She was discharged from Hartford Hospital on August 28, 2010, with a diagnosis of atrial fibrillation converted to sinus rhythm, rheumatic heart disease with mild mitral stenosis, mild mitral regurgitation, mild aortic stenosis, moderate aortic insufficiency, mildly dilated left atrium, with normal left

9

ventricular systolic function, diabetes, hypertension, and
hyperlipidemia [Tr. 266-67; 296-317]. She was advised to maintain
a low salt, low fat diet and avoid concentrated sweets, and
return to the Coumadin clinic on August 30, 2010. [Tr. 267, 300].
On discharge, her medications included Zocor, Glipizide ER (oral
blood glucose lowering drug), Avandia, Vitamin D3, Coumadin,
Cardizem CD. [Tr. 266-67; 300].

A note to the file dated August 31, 2010, states that when
plaintiff was hospitalized August 26-28, 2010, her atrial
fibrillation converted to sinus rhythm. [Tr. 289].

Plaintiff was seen at the Cardio Clinic at Hartford
Hospital/The Institute of Living for follow-up care on October
27, 2010. [Tr. 346]. Plaintiff complained of intermittent left
shoulder pain, worse with movement. "No chest pain, edema,
palpitations." [Tr. 346]. It was noted that plaintiff's stress
test was normal, she had no murmur, and remains in sinus, her
blood pressure was at goal. Advised to follow-up with PCP on
cholesterol. "Advised to walk and get back to her routine." [Tr.
346]. A return to clinic was suggested in six months. [Tr. 346].

Plaintiff was seen at Hartford Hospital/The Institute for
Living for follow-up care on November 2, 2010, post-
"hospitalization 8/26-8/28/10 for atrial fibrillation. No
complaints." [Tr. 290]. Plaintiff was continued on discharge
medications Cardizem and Coumadin and was being followed by

10

cardiology. [Tr. 290]. She was generally alert and oriented. The APRN noted that plaintiff's blood sugar was variable. Labs were ordered with a follow-up appointment scheduled for December 8.

Treatment notes from December 8, 2010, indicate plaintiff was complaining of back pain, vomiting, chest pain, right knee pain with swelling and headache, anxiety and depression. Her weight was 196 pounds. "Generally alert, oriented, teary" [Tr. 276]. The APRN noted that plaintiff had discontinued her diabetes medications although "was not supposed to stop." [Tr. 276]. Elevated blood sugar readings averaged 232 for the last seven days. [Tr. 276]. Her diabetes was "uncontrolled [due to] no meds [times] 1 month." [Tr. 277]. Plaintiff was advised to restart her diabetes medications. [Tr. 277]. Plaintiff complained of chest pain, left anterior burning into her left arm. "Present a long time. Intermittent couple times [a] week. [With] anxiety and depression." [Tr. 276]. She was described as generally alert, oriented, teary.  On examination, plaintiff's back was tender in the lumbar area without swelling. Plaintiff was prescribed conservative treatment with warm soaks and Tylenol.  Her right knee was swollen without tenderness and with full range of motion. Plaintiff was advised to wear a knee support and elevate her knee; there was no evidence of infection. It was noted, "chest pains a typical EKG NSR . . . [illegible], if persistent consider [illegible]. No Rx depression." [Tr. 277].

11

Sports Clinic

Plaintiff was treated at the Sports/OMT Clinic at Hartford Hospital/The Institute of Living on July 19, 2010. [Tr. 348-49]. Treatment notes state that plaintiff was last seen in February and March 2010, complaining of right knee pain. She received steroid injections on both occasions and also finished a course of physical therapy in April 2010. "As per patient, her pain symptoms were controlled from March to May." Thereafter the pain and swelling returned. She reported taking Tylenol two tablets a day for pain relief. [Tr. 348]. "Unemployed currently, says she is looking for a job but knee pain is interfering." [Tr. 348]. "Obesity-exercise and nutritionist discussed and advise about weight loss given. Also explained that her . . . knee is being made worse by [increased] weight." [Tr. 349].  Plaintiff received a Synvise One injection to her right knee on July 22, 2010. [Tr. 347].

### 4. **Hartford Hospital 2011**

Plaintiff was seen at Hartford Hospital/The Institute for Living for routine follow-up care on January 5, 21, 26; March 7, 15, and April 22, 2011. [Tr. 272-75; 280-81]. Treatment notes from January 5, 2011, indicate plaintiff was seen for follow-up for "resolving URI" and PAP. Her weight was 196 pounds; she was "general[ly] alert, oriented," with blood glucose improved.  [Tr.

274-75]. On January 26, 2011, plaintiff dropped off paperwork for disability; the Hospital noted "no income at present-current medical problem do not qualify for disability." [Tr. 275]. Plaintiff complained of right knee pain and swelling and will be referred to orthopedics for further evaluation. [Tr. 275]. Treatment notes from March 7, 2011, indicate plaintiff complained of depression, and extreme pain in her right knee with swelling and numbness. She weighed 194 pounds. She was taking no pain medication; an x-ray of her right knee on 2/9/10 showed minimal degenerative changes. Plaintiff was referred for counseling, an MRI of her right knee and a bone density scan. [Tr. 272-73].

Plaintiff was seen at the Emergency Department at Hartford Hospital on April 21, 2011. Dr. Vimal Rabdiya examined plaintiff with the following impression: "A 54 year-old female with coronary risk factors, diabetes, hypertension, and hyperlipidemia, comes with left upper chest pain and left shoulder pain for the last 2 months. This is non-anginal chest pain likely musculoskeletal in nature . . . Recommendations: (1) No further cardiac workup is needed at this point. Considering non-cardiac nature of chronic chest pain; (2) Analgesics with a follow-up with primary care physicians; and(3) She has already follow-up in Cardiology Clinic." [Tr. 344-45].  Hospital treatment notes from April 22, 2011, state plaintiff presented complaining of "chest pain, left sided which has been going on

13

last 3 months. Pain is 10/10, constant, feels like stabbing, no
radiation, worsened by raising her arm or coughing. No SOB/fever,
denies trauma or lifting weights. Has seen cardiology for the
same who reassured her that its musculoskeletal not cardiac. Went
to ER 2 days back for same. EKG-sinus tach, neg D-dimer, CXR-WNL,
got Percocet . . . admits to being depressed, poor sleep, poor
appetite, not suicidal. Assessment: chest pain: musculoskeletal,
worsened by depression; depression: poorly controlled symptoms.
Plan: trial of Naprosyn for 1 week, add PPI for history of GERD,
continue on Zoloft 50mg, will see crisis intervention next week,
can increase dose then." [Tr. 271].

Plaintiff was seen at the Cardio Clinic at Hartford
Hospital/The Institute of Living for follow-up care on May 25,
2011. [Tr. 343]. Plaintiff reported that she felt well. "Denies
chest pain, dyspnea, palpitations, edema. Recently started on
Sertraline and her mood is better now. She lost her insurance and
now has hard time to buy medicine." It was noted, "55 year old
[female] with mild valvular disease. PAF. Now stable." [Tr. 343].

Plaintiff was seen at Hartford Hospital/The Institute of
Living for follow-up monitoring of her diabetes on September 15,
2011, with no new complaints. Plaintiff reported right foot and
knee pain with an orthopedic consult pending, but that she never
received a physical therapy appointment. The APRN noted elevated
blood pressure, [tr. 332], that plaintiff has been compliant with

a low salt diet, has high blood sugar readings in the morning, and that her hypertension is not controlled with current medications. The APRN was going to resubmit a request for physical therapy for plaintiff's right knee pain. [Tr. 333].

Plaintiff was admitted to Hartford Hospital Emergency Department via EMS on October 12, 2011, complaining of nausea, shortness of breath, without sweating, with left chest pain "8/10 non-radiating, [with] pressure [patient] given [aspirin] en route" by EMS. [Tr. 321-29]. Plaintiff was "alert and in no apparent distress," normal systems, heart rate normal, rhythm regular, "left side chest wall, tender to palp-elicits exact pain squeeze of left pect[oral] elicits the exact pain." [Tr. 322]. Normal sinus rhythms were noted. [Tr. 325]. Plaintiff was discharged the same day with a diagnosis of chest pain-musculoskeletal and instructed to follow-up with her primary care physician. [Tr. 327-28].

Plaintiff was next seen on October 18, 2011, for a follow-up examination at Hartford Hospital/The Institute of Living. [Tr. 330-31]. Regarding hypertension, the APRN noted that plaintiff reported compliance with medications and stated her hospitalization for chest pain was diagnosed as musculoskeletal pain. Plaintiff stated she is experiencing occasional pain but less. [Tr. 330]. The APRN noted improved blood sugar control continues., and that plaintiff was generally alert and oriented.

[Tr. 330].

Plaintiff was then seen at the Cardio Clinic at Hartford Hospital/The Institute of Living for follow-up care on November 16, 2011. [Tr. 342]. Plaintiff complained of occasional "sharp, substantial chest pain it comes out most when she is anxious. She walks 6-7 blocks without any symptoms. Occasionally she has palpitations both at rest as well as with activities. It lasts for 5 minutes. No associated dizziness . . . No dyspnea, PND, . . . edema."[3] [Tr. 342]. Recommendations included a thirty day ICOP monitor to evaluate palpitations and PAF. "Advised lifestyle changes-diet, weight, exercise . . . . BP remains high." [Tr. 342].

### 5.   Consultative Evaluation

A physical evaluation consultation was performed on April 1, 2011, by Dr. Daniel Kordansky and Sheila Chunis. [Tr. 268-69]. Ms. Perez reported right knee pain and swelling, treated with Icy Hot.[4] She stated she was unable to stand for more than a minute; however, she did not use an assistive device such as a cane, walker or wheelchair. [Tr. 268]. Plaintiff also reported an admission to Hartford Hospital in August 2010, with "severe

---

[3] Ellipses indicate sections of the record where the handwritten notes are illegible.
[4] Ms. Perez's daughter helped to translate some of the questions because plaintiff reported she is primarily a Spanish speaker. [Tr. 268].

pressure in her heart;"  she stated she was diagnosed with "clogged arteries" and prescribed Coumadin, Cardizen and Warfarin. Plaintiff was also prescribed Glipizide and Metfomin to control her diabetes; however, her most recent blood sugar was 119. Plaintiff is taking a statin to control cholesterol; Methocarbamol for low back pain; Vitamin D for degenerative joint disease; and an anti-depressant for depression. [Tr. 268-69].

Plaintiff reported she is a social person, has a ninth grade education, can read and write. She stated that she lives by herself in a third floor apartment. She ascends the stairs slowly. She is able to cook and clean with some assistance. [Tr. 268].

On examination, the doctor stated, "it is my impression that this patient probably has coronary artery disease secondary to her diabetes. In addition, she probably has degenerative joint disease of her right knee. She has degenerative osteoarthritis probably in the lumbosacral area. She has depression, systolic hypertension and palpable right lobe of the thyroid gland. Clinically euthyroid." [Tr. 269].

### 6.    Physical Residual Functional Capacity Assessment

Relying on Dr. Kordansky's examination report, and after reviewing other relevant evidence in the record, Drs. Carol R. Honeychurch and Virginia H. Rittner concluded that plaintiff was

not disabled and her statements were partially credible. The
doctors found that plaintiff retained the capacity to perform
work with medium exertion. [Tr. 55-58, 67-70].

On November 22, 2010, Dr. Carol R. Honeychurch provided a
physical RFC assessment. [Tr. 55-58]. The doctor found that
although plaintiff had exertional limitations: she could
occasionally lift and/or carry fifty pounds; frequently lift
and/or carry twenty-five pounds; stand and/or walk a total of six
hours in an eight hour day, sit for a total of about six hours in
an eight hour day, and her ability to push and/or pull was
unlimited. [Tr. 57].  The doctor found no postural, manipulative,
visual, communicative, or environmental limitations, but found
plaintiff should avoid concentrated exposure to hazards. [Tr. 57-
58].

An additional physical RFC assessment was performed by Dr.
Virginia H. Rittner on April 6, 2011. [Tr. 68-70]. Dr. Rittner
made the same findings as Dr. Honeychurch. Both doctors stated,

> We reviewed your claim and found your condition
> results in some limitations in your ability to
> perform work related activities. However, these
> limitations do not prevent you from performing
> work you have done in the past  . . .  We have
> determined that your condition is not severe
> enough to keep you from working. We considered the
> medical and other information, your age,
> education, training, and work experience in
> determining how your condition affects your
> ability to work.

[Tr. 60, 71].

18

B.   *Mental Health*

      1.   **Mental Health Treatment Records**

Plaintiff received mental health treatment at Hartford Hospital/The Institute of Living Crisis Intervention Service-Psychiatry on April 28, May 18, August 16, September 19, October 17, November 14, December 19, 2011 and January 23, 2012.  [Tr. 334-38]. Plaintiff treated with Irene Wawrzyniak, APRN. There are no records of a psychiatric hospitalization or inpatient care.

Intake records on April 28, 2011, state plaintiff has a previous psychiatric history with inpatient admission (one week) in 1997 for depression followed by outpatient care from 1998-2000. "Then per [patient]-she felt better-not depressed." [Tr. 334]. Plaintiff reported feeling increasingly depressed beginning in December 2010, when she lost her employment. Her primary care provider started her on Zoloft 50 mg/day. Plaintiff reported she was crying less and sleeping better with the medication. Plaintiff reported difficulty with her thirty-seven year old daughter "who is not talking to her" and a twenty-four year old daughter "who is disrespectful." [Tr. 334]. The APRN observed a fifty-four year old Hispanic female "alert and oriented . . . [illegible], depressed and anxious mood, tearful, no suicidal or homicidal ideation, no psychotic symptoms, focus, concentration and attention good to interviewer, appetite low but patient

19

trying to decrease weight, energy fair, sleep better with Zoloft. Low pleasure-loves time with grandchildren. Patient babysitting almost [three year old] because daughter working." "Diagnosis-Axis I: Major Depression severe without psychotic features; Axis II: deferred; Axis III: diabetes, atrial fibrillation [remainder illegible]; Axis IV: limited supports, family conflict [remainder illegible]. Treatment plan-individual therapy and medication management." [Tr. 334].

Treatment notes from May 18, 2011, state that plaintiff was seen for follow-up with her two granddaughters "whom she babysits which is a positive diversion for her." Plaintiff was tearful, reporting her older daughter is still angry with her because plaintiff cares for younger daughter's child. The conflict has been since last year. The APRN noted that plaintiff's mood and anxiety was in "fair control." Appetite okay. Energy good. Sleep better with Zoloft. The APRN recommended no changes to the treatment plan. [Tr. 335]. A follow-up appointment was scheduled for June 27; however, plaintiff did not return for follow-up until August 16, 2011. [Tr. 335]. The APRN noted that plaintiff arrived with her two granddaughters. "[Patient] watches them but soon they will be going to school." It was noted appetite-good, energy-fair, sleeps well with Zoloft. Plaintiff's dosage of Zoloft was unchanged, "patient wants to continue current dose." [Tr. 335]. According to treatment notes from September 18, 2011,

plaintiff presented in casual dress and was well groomed. "Plaintiff moved [and is] happy with new apartment . . . . Grandchildren all in school now. Mood and anxiety in fair control. Appetite varies. Energy OK sleep better but varies with ongoing psychosocial stressors. [Patient] looking for a job-has to show proof to the state that she is looking." [Tr. 335-36]. Her Zoloft dosage was unchanged. [Tr. 336]. On October 17, 2011, it was noted that plaintiff's "mood and anxiety in good control. Appetite good. Energy OK. Sleep better-sometimes up late watching TV or EMA but not all the time." Her Zoloft dosage was unchanged. [Tr. 336]. Treatment notes from November 14, 2011, state plaintiff presented in casual dress and well groomed. "Client tearful because she wishes all family be present for Thanksgiving." Plaintiff complained of knee pain and left shoulder pain and using Naprosyn with some relief. Mood and anxiety reported in fair control. Appetite OK, energy and sleep were good. Plaintiff's Zoloft dosage was unchanged. [Tr. 337]. Again on December 19, 2011, plaintiff presented in casual dress and well groomed. Plaintiff reported that her unemployment was running out, "will not be able to afford cable. . . food." [Tr. 337]. She stated her daughter offered financial assistance and she was applying for state assistance. Mood and anxiety in fair control. Appetite or energy varies. "Sleep depends on psychosocial stressors." The APRN increased plaintiff's Zoloft

21

dosage to 100mg. [Tr. 337]. Plaintiff was seen for follow-up on January 23, 2012, presenting in casual dress and well groomed. "I spent Saturday crying all day with the snow."  The APRN noted, however, that plaintiff complained of "no new stressors and actually feeling a little calmer overall with Zoloft." Her mood and anxiety were in fair control. Appetite and energy was good. "Sleep varies but better . . . ."  Plaintiff was continued on 100mg of Zoloft. [Tr. 338].

There are no other treatment records after January 2012. Plaintiff was prescribed 100mg of Zoloft on February 11, 2012. [Tr. 341].

### 2.   Mental Illness Questionnaire

Irene Wawrzyniak, APRN, who completed a mental illness questionnaire on May 14, 2012, indicated that she has provided individual therapy and medication management to plaintiff beginning April 28, 2011, with last treatment on May 7, 2012. [Tr. 351-53]. The APRN stated that Ms. Perez was compliant with treatment and was experiencing no medication side effects. [Tr. 351]. Ms. Wawrzyniak did not opine whether plaintiff could work using moving parts and dangerous machinery, stating, "Pt may need PT evaluation." [Tr. 351].  Her diagnoses were Axis I: 296.33 [major depressive disorder, recurrent, severe without psychotic features]; Axis II: deferred; Axis III: diabetes, atrial

fibrillation, hyperlipeds, Vit D deficiency; Axis IV: limited support, family conflict, financial stress; Axis V (current): 50; GAF Past year: 50.  The APRN commented that patient was "overwhelmed at times with ongoing psychosocial stressors, i.e., conflict with a daughter ongoing (not talking to her) granddaughter pregnant a 15 yo and has to leave home. [Patient] struggling with what to do and how to cope." [Tr. 351]. The APRN identified the following symptoms despite compliance with treatment: depression and anxiety not in remission, decreased energy, fatigue, anhedonia, tearfulness, sleep disturbance, motor tension, low stress tolerance and poor coping skills, overwhelmed, low pleasure. [Tr. 352]. The APRN opined that plaintiff could not complete a normal workday/workweek without interruptions and could not perform basic work activity at a consistent pace in an eight hour day with appropriate breaks because her psychiatric symptoms are not in remission and she has limited support. [Tr. 352]. The APRN opined that plaintiff could not withstand the stress occasioned by seeking, learning and sustaining competitive employment because her "psychiatric symptoms are not well controlled and plaintiff needs ongoing treatment and reevaluation."   [Tr. 353].

### 3.   Mental Residual Functional Capacity Assessment

A mental RFC assessment was performed by Irene M. Wawrzyniak, APRN, on June 28, 2012. [Tr. 358-62]. The APRN

summarized plaintiff's diagnosis, symptoms and prognosis as to
her ability to work as follows: "severe depression, anxiety, low
energy, interrupted sleep, appetite varies, Sister died 3/12 and
pt also bereaved. Pt hurt by a daughter that refuses to have
anything to do with her. 15 yo niece pregnant. Pt has no money,
no job and no TV." [Tr. 358]. The APRN opined that plaintiff's
disorder was exacerbated by a chronic illness.  Her DSM-IF
diagnoses were Axis I: 296.33 [major depressive disorder,
recurrent, severe without psychotic features; Axis II: deferred;
Axis III: A-Fib; Axis IV: health concerns sister died 3/12,
financial problems, family conflict; Axis V GAF score: 50
current, 50-55 highest level past year. [Tr. 358]. While noting
that plaintiff had understanding and memory limitations, the APRN
found that plaintiff was not significantly limited in ability to
remember locations and work-like procedures, understand and
remember very short and simple instructions; and moderately
limited in her ability to understand and remember detailed
instructions. Regarding sustained concentration and persistence,
the APRN found plaintiff was not significantly limited in the
ability to carry out very short and simple instructions or make
simple work-related decisions, but she found plaintiff moderately
limited in her ability to carry out detailed instructions and
sustain simple work-related decisions. The APRN found that
plaintiff was markedly limited in maintaining attention and

concentration for extended periods, performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances, coordinating with or in proximity to others without being distracted by them and making simple work related decisions, in completing a normal workday and workweek without interruptions from psychologically based symptoms and in performing at a consistent pace without an unreasonable number and length of rest periods.  [Tr. 359].

With regard to social interaction, the APRN found that plaintiff was not significantly limited in her ability to interact appropriately with the general public, ask simple questions or request assistance, or maintain socially appropriate behavior and adhere to basic standard of neatness and cleanliness. The APRN found plaintiff moderately limited in accepting instructions and responding appropriately to criticism from supervisors and markedly limited in getting along with co-worker's or peers without distracting them or exhibiting behavioral extremes. [Tr. 360].

With regard to adaptation, the APRN found plaintiff was not significantly limited in her awareness of normal hazards/taking appropriate precautions, and traveling in unfamiliar places/using of public transportation but found her moderately limited in her ability to respond appropriately to change in the work setting and in setting realistic goals or making plans independently of

25

others. [Tr. 360].

The APRN listed no hospitalizations or in-patient treatment. For outpatient treatment, the APRN recommended individual therapy and medication management. [Tr. 361]. Plaintiff was prescribed Zoloft 100mg.  The form was co-signed by Dr. Evan Fox on June 28, 2012. [Tr. 362].

**C.**   ***Work History Report***

Plaintiff completed a Work History Report (undated), stating she worked for the Holo-Krome Company as an assembler from 1997 through 2009. [Tr. 243]. She was employed full time, assembling Allen tools and in the shipping department. Her duties included use of machines, tools or equipment, writing, and completing reports. Plaintiff estimated she walked two hours, stood five hours, sat one hour and stooped one hour out of an eight hour day [Tr. 242]. Her duties also included lifting/carrying boxes of tools approximating a maximum of ten pounds. [Tr. 241-42].

**D.**   ***Activities of Daily Living Report***

Plaintiff completed an Activities of Daily Living ("ADL") report on September 8, 2010, with the assistance of her daughter. [Tr. 233-40]. At the time of the report, plaintiff was living in an apartment on her own. [Tr. 233].  She described that a typical day includes walking for fifteen minutes, small exercises for her knee and trips to doctor appointments and/or labs every two to three days. Before her illness, plaintiff stated she used to go

on bus trips, long drives and vacation and climb three flights of
stairs. [Tr. 234]. She stated her sleep is interrupted by heart
palpitations, "lung breathing" and leg cramps. [Tr. 234]. She did
not provide an explanation how her illness affected her ability
to dress, bathe, care for hair, shave, feed herself, or use the
toilet. [Tr. 234]. She stated she needed no special reminders to
take care of personal grooming or to take medication. [Tr. 234].
Plaintiff indicated she prepared her own meals daily (grilled
meat, steamed vegetables), following a low/no salt and no sugar
diet plan. [Tr. 235]. Plaintiff states she shops for food once a
week for approximately thirty to forty-five minutes.  [Tr. 237].
With regard to housework, she stated she is able to clean, do
laundry twice a week for forty-five minutes, although she needs
assistance carrying the laundry downstairs. [Tr. 236]. Plaintiff
did not indicate how often she goes outside but stated she
travels by car with others as she does not own a car or drive.
[Tr. 236]. She indicated she can pay bills, count change and use
a checkbook/money orders, and her ability to handle money has not
changed since her illness. [Tr. 237].  Plaintiff listed her
hobbies as reading and watching television. She stated she goes
out less since her illness because she lives on the third floor.
[Tr. 237]. Social activities include speaking to friends/family
twice a week. She has no problems getting along with
family/friends/neighbors/others. [Tr. 238]. She indicated she
does not need reminders to go places but needs someone to
accompany her.

     With regard to her abilities, plaintiff indicated she has

difficulty lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, and completing tasks due to the knee pain and cramping. [Tr. 238]. She estimated she can walk approximately fifteen minutes with a rest interval of twenty minutes. [Tr. 239]. She can pay attention all day, can finish what she starts, can follow spoken instruction, gets along with authority figures, has never lost a job because of problems getting along with others, and handles stress and change in routine well. [Tr. 239]. Plaintiff uses glasses to correct her vision. [Tr. 239].

Plaintiff completed another Activities of Daily Living ("ADL") report on December 10, 2010, with the assistance of her daughter. [Tr. 209-16]. She gave the same responses to the questionnaire. Id.

### E.   Disability Report-Field Office

A Disability Report-Field Office was completed on August 31, 2010, by K. Sivels after an in-person interview with the claimant. [Tr. 195-97]. The interviewer observed no difficulties with hearing, reading, breathing, understanding, coherency, concentration, talking, answering, sitting, standing, walking, seeing, using hands or writing. The field officer noted that,

> Ms. Perez was a very nice woman that did not speak English but preferred Spanish because it is easier for her to understand and respond faster to the questions. Her daughter was there to help her. She took her time when walking so she would not get out of breath. She explained that without her medications her heart would beat like crazy and cause her to feel faint. Since she has been on the

28

meds the last few days she is beginning to feel
better but fear that a heart attack is right
around the corner.

[Tr. 196].


Another Disability Report-Field Office was completed on
December 1, 2010, by C. Lee after an in-person interview with the
claimant. [Tr. 206-08]. The interviewer observed no difficulties
with hearing, reading, breathing, understanding, coherency,
concentration, talking, answering, sitting, standing, walking,
seeing, using hands or writing. The field officer noted that,
"Claimant was very pleasant and polite. No limitations were
perceived." [Tr. 207].

### V.   HEARING TESTIMONY

### A.   Plaintiff's Testimony

Plaintiff, represented by counsel, testified before ALJ
William J. Dolan on May 16, 2012. [Tr. 25-51].  Vocational
Expert ("VE") Courtney Olds was present and testified. A Spanish
interpreter, Robert Coletti, was also present. The hearing was
conducted in English with the interpreter on stand-by at the
request of plaintiff's counsel. [Tr. 28].

At the time of the hearing, plaintiff was living on her own
in a first floor apartment. [Tr. 29].

Plaintiff was laid off on November 20, 2009, because
her employer's business operation relocated out of state.
Unemployment compensation benefits stopped on November 19, 2011.

29

The ALJ asked, "Let's say that the factory hadn't closed, could you have continued working there?" Plaintiff responded "Yes." [Tr. 31]. Plaintiff stated that her job involved both standing and sitting, and lifting approximately ten pounds. [Tr. 32].

Addressing problems that limit her ability to work now, plaintiff responded right knee pain, cholesterol, hands and a heart condition. [Tr. 33, 35-36]. She stated she takes Tramadol to relieve her knee pain [tr. 46], that the medication did not relieve her pain, and makes her sleepy. [Tr. 33, 47]. She testified she experiences heart pain every day, she is unable to walk six to seven blocks as she claimed in November 2011, and that her condition has worsened. [Tr. 34]. Currently, she stated, she could walk two blocks before having to stop and take a break, tolerate about fifteen minutes of standing, and lift about five pounds. [Tr. 35]. She testified that she experienced pain in her hands when she was working as an assembler, although she was not being treated at the time of the hearing. [Tr. 36].

Regarding her mental health, plaintiff testified she was in treatment for depression and continued to experience symptoms. "I no feel good to work because before no find another job when I finished my job everything is coming down, I can't handle no more. I have to waiting for my daughter pay my bills, and I to work because I like it work but right not no feel . . . ." [Tr. 37]. She stated she sometimes sleeps "okay." [Tr. 37]. Plaintiff

stated she tried suicide once but does not have those thoughts now, anddenied hearing voices. [Tr. 39]. She reported low energy. [Tr. 39].

Regarding her obesity, she stated she "lost some weight" and has been advised by her doctor that weight loss will help her knee and her hand. At the time of the hearing, plaintiff weighed 204 pounds. [Tr. 37].

Regarding her ability to pay attention/concentrate, plaintiff testified that she has problems, for example, falling to sleep. [Tr. 37].

Plaintiff stated she stopped babysitting her grandchildren in 2010, although there are treatment records stating she brought her grandchildren to appointments in May and August 2011. She said, "that's only when she . . . don't have nobody to take care she call me." [Tr. 38]. Plaintiff has a friend she gets together with to drink coffee and talk [tr. 38], but she has no hobbies. [Tr. 39].

Regarding ADLs, plaintiff rises between eight and nine in the morning, washes up, checks her blood sugar, takes her medicine, drinks coffee, cleans her bed, listens to the radio, cooks, cleans, grocery shops, and attends church on Sunday. [Tr. 39-40]. She stated her daughter does her laundry. [Tr. 40].

On examination by her attorney, plaintiff stated that while she was working she was a diabetic, obese, with high blood

31

pressure. [Tr. 40-41]. Since she lost her job, her knees started swelling and she has had problems with her heart. [Tr. 41]. She explained that her suicide attempt was before she was working full time. She had a one-week hospitalization. [Tr. 41-42]. She liked working. She said that, "When I lost my job everything's gone down, I looking for a job before I apply application but I no finding anything." [Tr. 42]. Although she applied for jobs while receiving unemployment, there came a time when she realized she could no longer work. [Tr. 43]. She testified that her sleep is interrupted because her diabetic condition requires multiple bathroom visits throughout the night. [Tr. 44]. Her cooking involves making coffee and reheating frozen food in the microwave oven. [Tr. 44]. Plaintiff was babysitting her grandchildren once or twice a week, adding it was difficult to sit for a nine and three year old "because they screaming a lot." [Tr. 45]. The grandchildren were now in day care and had a baby sitter. [Tr. 46]. Plaintiff stated her daughters pay her bills. [Tr. 46]. She had difficulty sitting for prolonged periods due to pain in her knee and legs. [Tr. 47]. As an assembler, she had to finish five hundred pieces a day. She stated she could not do that job today. [Tr. 48]. "Because with my medicine I take for the depression, that one they putted me to sleep, right now I no feel that with a job I doing before." [Tr. 48].

B.                    *Vocational Expert Testimony*

Vocational Expert ("VE") Courtney Olds testified at the hearing on May 16, 2012. [Tr. 49-50].

With regards to the exertional and skill requirements of plaintiff's last job, the VE stated that the Dictionary of Occupational Titles (DOT) classifies a small parts assembler as "light, but based on Ms. Perez's testimony today it sounds like it was – she performed it at sedentary exertional level, it's unskilled work, has a [specific vocational preparation] SVP of 2."[5] [Tr. 49].

In the first hypothetical, the ALJ asked the VE to assume a person of the claimant's age, education, and work history with a capacity for medium work; with a need to avoid concentrated exposure to hazards, and asked whether such a person would be able to perform her past job?  The VE responded, "Yes, I believe so." [Tr. 49].

In the second hypothetical, the ALJ asked the VE to assume that the individual would be limited to performing simple, routine tasks in a stable work environment, where the work processes and procedures are fairly constant, and asked whether such a person would be able to perform the claimant's past job?

---

5 The DOT lists a specific vocation preparation (SVP) time for each described occupation. Using the skill level definitions in 20 C.F.R. 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.

The VE responded he believed so. [Tr. 49-50].

The final hypothetical posed by the ALJ asked the VE to assume a person with claimant's alleged symptoms and limitations based on the APRN's opinion, that this person would be limited to sedentary work, probably unable to even perform sedentary work on a sustained basis and would be disabled under the GRIDs or under Social Security rulings 96-8 or 85-15. "Is your testimony . . . consistent with the Dictionary of Occupational Titles? The VE responded, "Yes, I believe so." [Tr. 50].

Plaintiff's counsel declined to cross-examine the VE. [Tr. 50].

### VI. LEGAL STANDARD AND SCOPE OF REVIEW

This Court's review of the Commissioner's decision is limited, as it may be set aside only due to legal error or if it is not supported by substantial evidence. See 42 U.S.C. §405(g) (providing that the Commissioner's factual findings are conclusive if supported by substantial evidence); Yancey v. Apfel, 145 F.3d 106, 110-11 (2d Cir. 1998). "Substantial evidence" is less than a preponderance but "more than a mere scintilla" and as much as "a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). "Thus, as a general matter, the reviewing court is limited

to a fairly deferential standard." <u>Gonzalez ex rel. Guzman v. Commissioner</u>, 360 Fed. Appx. 240, 242 (2d Cir. 2010) (summary order) (citing <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998)). If the decision of the ALJ evinces legal error or is unsupported by substantial evidence, the Act provides that the "Court shall have the power to enter . . . a judgment . . . reversing a decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

To be considered disabled under the Act and therefore entitled to benefits, Ms. Perez must demonstrate that she is unable to work after a date specified (in her application, she claimed January 1, 2010) "by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." <u>Id.</u>; §423(d)(1)(A). Such impairment or impairments must be "of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." <u>Id.</u> § 423(d)(2)(A); <u>see also</u> 20 C.F.R. § 404.1520(c) (requiring that the impairment "significantly limit [ ] . . . physical or mental ability to do basic work activities" to be considered "severe").

There is a familiar five-step analysis used to determine if a person is disabled. See 20 C.F.R. § 404.1520. In the Second Circuit, the test is described as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)) (alterations in original).

Through the fourth step, "the claimant carries the burdens of production and persuasion, but if the analysis proceeds to the fifth step, there is a limited shift in the burden of proof and the Commissioner is obligated to demonstrate that jobs exist in the national or local economies that the claimant can perform" given what is known as her "residual functional capacity." Gonzalez, 360 Fed. Appx. at 243 (citing Poupore v. Astrue, 566

36

F.3d 303, 306 (2d Cir. 2009) (per curiam)). "Residual functional capacity" is what a person is still capable of doing despite limitations resulting from her physical and mental impairments. See 20 C.F.R. §416.945(a).

"In assessing disability, factors to be considered are (1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Bastien v. Califano, 572 F.2d 908, 912 (2d Cir. 1978). "[E]ligibility for benefits is to be determined in light of the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied." Id. (quotation marks and citation omitted).

### VII. ALJ'S DECISION

In this case, the ALJ undertook the prescribed five-step analysis and concluded that Ms. Perez was not disabled. After finding, at step one, that she had not engaged in any substantial gainful activity since January 1, 2010, her alleged onset date, [tr. 12], the ALJ determined, at step two, that Ms. Perez had the following severe impairments: obesity, depression, right knee osteoarthritis, atrial fibrillation, diabetes and hypertension. [Tr. 13].  At step three, the ALJ concluded that plaintiff did

"not have an impairment or combination of impairments that meets or medically equals one of the listed impairments" in 20 C.F.R. Part 404, Subpart P, Appendix 1. [Tr. 13].

Since the ALJ found that Ms. Perez was not disabled *per se* at step three, he proceeded to step four, which is to identify his "residual functional capacity," or "RFC." The ALJ found that plaintiff retained the RFC to perform:

> Medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c) except that she needs to avoid concentrated exposure to hazards and is limited to performing simple, routine tasks in a stable work environment.

[Tr. 15].

At step four, the ALJ found that plaintiff was capable of performing her past relevant work as a small parts assembler. [Tr. 19].  Thus, the ALJ found plaintiff not disabled within the meaning of the Act from January 1, 2010, through the date of his decision. [Tr. 19].

## VIII.    DISCUSSION

On appeal, plaintiff asserts the following arguments for reversal or remand:

1. Whether the ALJ properly assessed all of plaintiff's impairments;

2. Whether the ALJ properly determined plaintiff's RFC;

3. Whether the ALJ properly assessed plaintiff's credibility;

4. Whether the ALJ properly followed the treating physician rule.

The Court will consider each of Ms. Perez's arguments in turn.

**A.   *Step Two: Determination of Plaintiff's Impairments***

Plaintiff briefly argues that the ALJ failed to consider all of her impairments because he referred to plaintiff's heart impairment as "atrial fibrillation", [tr. 13], rather than quoting her discharge diagnosis from her August 2010 hospitalization. [Tr. 299, Doc. #12 at 18]. Plaintiff contends that it was not enough for the ALJ to refer to her cardiac impairment as "atrial fibrillation," [tr. 13], when her discharge diagnosis on August 26, 2010, "after a two day hospital stay was atrial fibrillation converted to sinus rhythm, rheumatic heart disease with mild mitral stenosis, mitral regurgitation, diabetes, hypertension, hyperlipidemia." [Doc. #12 at 18, citing, Tr. 299]. The Commissioner argues that the ALJ's citation to atrial fibrillation subsumes plaintiff's related heart impairments. [Tr. 15 at 4]. Indeed, the ALJ references this record as well as other cardiac treatment records that post-date this particular hospitalization. [Tr. 17-18]. The Court does not find that the ALJ erred by failing to quote from this discharge document.

39

Plaintiff also argues that the ALJ erred by failing to mention the existence of a possible back impairment cited by the consultative examiner Kordansky, which appears in a CT scan, is mentioned in the record and was alleged by the claimant. [Tr. 12 at 18]. Plaintiff cites three references in the record to support her claim of error. A radiological report of a CT angiogram of the chest dated August 26, 2010, noted "degenerative changes of the spine."[6] [Tr. 313].  On December 8, 2010, plaintiff was complaining of lower back pain, vomiting, chest pain, right knee pain and headache. [Tr. 276]. The APRN noted, "LBP [lower back pain] across lumbar area X1 day, no radiation, no fever, no bowel

---

6 It would be fair to characterize this mention of plaintiff's back as a passing reference. The complete findings state,

    Vasculature. No filling defects in the main, lobar
    or segmental pulmonary arteries to suggest
    pulmonary embolism

    Lung. No diffuse or focal lung parenchymal
    abnormalities. No pneumothorax or pleural effusion.

    Mediastinum. Mediastinal and cardiac structures are
    unremarkable. No pericardial effusion. No
    lymphadenopathy.

    Visualized portions of the upper abdomen are
    unremarkable. The patient is status post
    cholecystectomy.

    Degenerative changes of the spine are noted.

    IMPRESSION: No evidence for pulmonary embolus. No
    other significant intrathoracic abnormality.

[Tr. 313].

or urinary symptoms." [Tr. 276]. On April 9, 2011, the CE noted that, "When the plaintiff was asked to touch her toes she was able to flex lumbosacral area approximately 160 degrees although tenderness was elicited in the lumbosacral area." [Tr. 269].

The Court finds that, although it is unclear whether the ALJ failed to consider these four medical records at step two, any such error is harmless.

A step two determination requires the ALJ to determine the severity of a claimant's impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). A claimant carries the burden of establishing that she is disabled and must provide the medical and other evidence necessary to make determinations as to disability. 20 C.F.R. § 404.1512(a). An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. SSR 96-3p, 1996 WL 374181, at *1. Impairments that are "not severe" must only be a slight abnormality that has a minimal effect on an individual's ability to perform basic work activities. Id.; SSR 85-28, 1985 WL 56856, at *3.

At step two, if the ALJ finds an impairment is severe, "the question whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." Pompa v. Comm'r of Social Security, 73 Fed. Appx. 801, 803 (6th Cir. 2003). "Under the regulations, once the ALJ determines that a claimant has at least one severe impairment, the ALJ must

consider all impairments, severe and non-severe, in the remaining steps." Id. (citing 20 C.F.R. § 404.1545(e)). While the Second Circuit has not directly stated that incorrectly applying the step two legal standard is harmless error, when some of a claimant's impairments are determined to be severe and others not, other circuits have so stated. See, e.g., Carpenter v. Astrue, 537 F.3d 1264, 1266 (10th Cir. 2008) ("Nevertheless, any error here became harmless when the ALJ reached the proper conclusion that [plaintiff] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). A harmless error approach is consistent with the Second Circuit's finding that step two severity determinations are to be used only to screen out de minims claims. See Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).

Here, the ALJ found that plaintiff had the following severe impairments: obesity, depression, right knee osteoarthritis, atrial fibrillation, diabetes and hypertension. (Tr. at 13). There is no claimed error as to finding these impairments severe. In considering obesity, the ALJ stated that he considered the combined effects obesity has with other impairments, stating that, "someone with obesity and arthritis effecting a weight-bearing joint may have more pain and limitation than might be expected from arthritis alone. (Social Security ruling 02-1p)." While the ALJ did not specifically reference lower back pain, the

Court can find no error. Although the ALJ did not specifically list the discharge diagnosis from August 26, 2010, he discussed the record and other evidence with respect to which error is claimed. [Tr. 17]. There is sufficient evidence to conclude that the ALJ considered the records at issue.

Nevertheless, because the ALJ did find several severe impairments and proceeded in the sequential process, all impairments, whether severe or not, were considered as part of the remaining steps. This result fits within the Second Circuit's description of step two as a screen for claimants with less than de minimis impairments. Accordingly, the ALJ's failure to specifically determine whether each of plaintiff's claimed impairments was severe is harmless error, and would not support a reversal of the Commissioner's decision. See Jones-Reid v. Astrue, 934 F. Supp. 2d 381, 402 (D. Conn. 2012) (Fitzsimmons, MJ) (finding harmless error where ALJ failed to discuss other impairments); Britt v. Astrue, 468 Fed. Appx. 161, 163, 2012 WL 2331645 (2d Cir. June 20 2012) (finding claimant's argument, that the ALJ erred at step two, was "without merit because [the claimant] did not furnish the ALJ with any medical evidence showing how these alleged impairments limited his ability to work.").

**B.**   ***Residual Functional Capacity Determination***

Plaintiff's next assignment of error is that the ALJ's RFC is not supported by substantial evidence. The ALJ determined that plaintiff had the RFC "to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), except that she needs to avoid concentrated exposure to hazards and is limited to performing simple, routine tasks in a stable work environment." [Tr. 15]. The ALJ found that plaintiff's past relevant work as a small parts assembler does not require the performance of work-related activities precluded by her RFC. [Tr. 19 (citing 20 CFR 404.1565 and 416.965)].

Plaintiff argues that: (1) the ALJ "findings are inconsistent with an RFC finding of medium [work]" and his underlying "findings of fact underlying the RFC are not supported by the record"; (2) the ALJ's characterization of plaintiff's August 26, 2010, hospitalization is not supported by the record; (3) the ALJ's "summary of the subsequent treatment for chest pain is also contrary to the record."; (4) the ALJ "recognized no limitations from the obesity, diabetes, knee pain or hypertension . . . even though [the ALJ] found they caused more than slight functional limitations  . . . ."; (5) the ALJ's RFC failed to provide for additional limitation due to a severe mental impairment; (6) the ALJ failed to identify "the source of opinion evidence he relied on or the function by function limitations

44

caused by the severe impairments he identified"; and (7)  the ALJ
failed to consider the effects of obesity as required by SSR 02-
1p, 2000 WL 628049, (Sept. 12, 2002).  [Doc. #12 at 19-26].

### 1.    RFC to do "Medium Work"

Plaintiff briefly argues that the "ALJ's findings are
inconsistent with an RFC of medium work," and his underlying
findings of fact are not supported by the record. [Tr. 12 at 19].
However, the physical RFC finding is consistent with the state-
agency medical consultants who reviewed plaintiff's records and
opined that she was capable of performing medium work involving
no concentrated exposure to hazards. [Tr. 57, 68]. As the ALJ
noted, these doctors did not find any evidence of any mental
impairment because plaintiff did not seek treatment for
depression until <u>after</u> the state-agency medical consultants
offered their opinions. <u>Id.</u> Moreover, when plaintiff applied for
benefits, she did not allege that any mental impairment(s)
limited her ability to work. [Tr. 189, 217, 225]. Thus, there was
no reason for the Commissioner to investigate an issue that was
not raised by plaintiff.  Nevertheless, after considering
plaintiff's mental health treatment records, the ALJ noted that
plaintiff experienced no episodes of decompensation of extended
duration, no psychiatric hospitalization, and no evidence of a
significant drop in personal or adaptive functioning to indicate

an episode of decompensation. [Tr. 14]. Notwithstanding the lack of paragraph B and C evidence, the ALJ gave plaintiff "as much benefit of the doubt as possible," concluding that her low stress tolerance and depressed mood limited her to "performing simple, routine tasks in a stable work environment."[7] [Tr. 14-15].

Defendant states that the "crux" of plaintiff's argument is that she cannot perform the standing/lifting required of medium work; however, "[plaintiff's argument] is entirely speculative and she offers no support for her conclusion." [Tr. 15 at 6-7]. That said, defendant correctly states that the only medical opinions of record that discuss plaintiff's physical RFC each conclude that she is capable of a range of medium work activity despite her age and severe impairments. [Tr. 57, 68]. Finally, the Court notes that the ALJ found that plaintiff was capable of performing her past relevant work as a small parts assembler, "as actually and generally performed." [Tr. 19]. As classified by the VE, this was light work performed at the sedentary level, and unskilled with a specific vocational preparation code of 2.[8] [Tr.

---

7 The Court addresses, in more detail, plaintiff's other arguments that the ALJ erred in assessing her mental health later in this opinion.
8 Specific Vocational Preparation ("SVP") is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. Dictionary of Occupational Titles, 4th ed. revised 1991), Appendix C. Using the skill level definitions in 20 C.F.R. §404.1568, unskilled work corresponds to an SVP of 1-2;

19].  The Court finds no error here and plaintiff has not carried her burden of production on this claim.

### 2.  August 2010 Hospitalization and Chest Pain

Plaintiff next argues that the ALJ's characterization of plaintiff's August 26, 2010, hospitalization is not supported by the record. While it is true that the ALJ did not summarize the hospital discharge document with the same specificity as plaintiff, there is no question that the ALJ considered this document along with all of plaintiff's cardiology records. [Tr. 17].  And it is also true that the ALJ determined that plaintiff's heart condition was a severe impairment. [Tr. 19]. Plaintiff takes issue with the ALJ's statement that "plaintiff was admitted for two days and remained stable from a cardiac standpoint." [Tr. 17].  Treatment notes confirm that plaintiff's vital signs were stabilized upon discharge. [Tr. 300]. Moreover, subsequent treatment records note that medication controlled her heart rate, [tr. 291], her subsequent cardiac workups were negative, [tr. 321-29, 344-45], and any subsequent chest pain was identified as musculoskeletal rather than cardiac in nature. [Tr. 321-29, 344-45].  While plaintiff takes issue with the ALJ's summary of her subsequent treatment for chest pain, particularly

semiskilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9. Social Security Ruling ("SSR") 00-4p.

the April 21, 2011, emergency treatment for chest pain, the records clearly state she was experiencing "non-anginal chest pain likely musculoskeletal in nature." [Tr. 345].  The record further states, "[n]o further cardiac workup is needed at this point. Considering noncardiac nature of chronic chest pain." [Tr. 345]. Plaintiff argues, without citation to the evidence of record, that "Perez's mental health problems are the underlying causes of the very real physical manifestations." [Doc. #12 at 21].  On this record, the Court finds no error.

### 3.   Other Limitations

Plaintiff argues that the "ALJ recognized no limitation from the obesity, diabetes, knee pain or hypertension . . . even though he found that they caused more than slight functional limitations that interfered with Perez's ability to perform work related activity." [Tr. 12 at 22]. The ALJ's opinion clearly demonstrates that he considered the consulting medical evaluation by Dr. Kordansky [tr. 7], and RFC findings from the state agency non-examining physicians Drs. Honeychurch and Rittner, who considered all of plaintiff's impairments.  [Tr. 19, 53-58, 62-70].  Plaintiff contends that the ALJ erred in adopting the opinions of Drs. Honeychurch and Rittner, which "incorporated no additional limitations for any of these impairments." However, the ALJ is not required to assess additional limitations for each

impairment. Burns v. Astrue, No. 2:11-cv-151-GZS, 2012 WL
313705, *4 (D. Mass. Jan. 30, 2012) ("Contrary to the plaintiff's
suggestion, a finding of a severe impairment need not always
result in limitations in an RFC.") (citing Burkstrand v. Astrue,
436 Fed. Appx. 177, 180 (9th Cir. Sept. 15, 2009) ("To the extent
Burkstrand suggests that a finding of severe impairment at Step 2
necessarily requires limitation on a claimant's ability to
perform basic work activities, this argument has no merit.") and
Hughes v. Astrue, No. 1:09cv459, 2011 WL 4459097, at *10
(W.D.N.C. Sept. 26, 2011) (A finding of a "severe" impairment at
step two "is not proof that the same limitations have the greater
significant and specific nature required to gain their inclusion
in an RFC assessment at step four."). This is particularly true,
where as here, the ALJ noted that the claimant's physical and
mental symptoms are controlled with medication. [Tr. 18].
Therefore, the ALJ's finding that plaintiff's obesity, diabetes,
knee pain and hypertension are severe impairments at step two did
not necessarily require the ALJ to include limitations from such
impairments in his analysis at step four.

Plaintiff also argues that the ALJ erred in failing to
provide greater limitations for a mental impairment for an
individual who is also "uneducated, illiterate and not []able to
speak English beyond rudimentary conversation." [Doc. #12 at 23].
"Contrary to plaintiff's argument, a restriction to unskilled

work does constitute a limitation on an individual's functional capacity." Hughes, 2011 WL 4459097, at *10, doc. #12 at 22-23. The record shows that plaintiff attested that she could speak and understand English, [tr. 188, 196], and at the hearing, despite having a Spanish speaking interpreter, she proceeded in English. [Tr. 27-28]. The Commissioner recognized that plaintiff had a limited education and difficulty with reading and writing in English. [Tr. 188, 190].  On this record, the Court finds no error.

### 4.   Exertional and Nonexertional RFC

Plaintiff argues that the ALJ "failed to identify the source of opinion evidence he relied on or failed to make specific findings on a function-by-function basis caused by the severe impairments he identified." [Tr. 12 at 24 (emphasis added)].

However, the record shows that the ALJ identified two state-agency non-examining medical physicians. [Tr. 19, 57 (Dr. Carol R. Honeychurch) and 68 (Dr. Virginia Rittner)]. The ALJ stated, "[w]hile the undersigned notes that these opinions are from non-examining and non-treating expert sources, they are not inconsistent with the medical evidence as a whole, and are accorded evidentiary weight in determining the claimant's residual functional capacity identified above." [Tr. 19].  In determining plaintiff's nonexertional RFC, the ALJ acknowledged

that the non-examining and non-treating expert sources did not
address plaintiff's mental health "due to the fact that the
claimant did not seek treatment until April 2011- <u>after</u> these
determinations were made."[9] [Tr. 19 (emphasis added)]. Plaintiff
argues that the "nonexertional limitations incorporated in [the
ALJ's] RFC are unsupported by any medical opinion whatsoever"[10]
[Doc. #12 at 25], and "neither DDS or the ALJ sought the opinion
of a medically acceptable source to determine whether the
claimant's allegations regarding her psychiatric limitations were
supported by the record." [Doc. #12 at 35].   Yet, Drs.
Honeychurch and Rittner found no postural, manipulative, visual,
communicative, or environmental limitations, but found plaintiff
should avoid concentrated exposure to hazards.[11] [Tr. 57-58; 69].
The Commissioner concedes that "the ALJ did not ground the

---

9 Plaintiff's psychiatric intake records are dated April 28,
2011. [Tr. 334].
10 "Exertional capacity addresses an individual's limitations and
restrictions of physical strength and defines the individual's
remaining abilities to perform each of seven strength demands:
sitting, standing, walking, lifting, carrying, pushing, and
pulling." SSR 96-8p, at *5, 1996 WL 374184 (July 2, 1996).
11 "Nonexertional capacity considers all work-related limitations
and restrictions that do not depend on an individual's physical
strength; i.e., all physical limitations and restrictions that
are not reflected in the seven strength demands, and mental
limitations and restrictions. It assesses an individual's
abilities to perform physical activities such as postural (e.g.,
stooping, climbing), manipulative (e.g., reaching handling),
visual (seeing), communicative (hearing, speaking), and mental
(e.g., understanding and remembering instructions and responding
appropriately to supervision)," as well as ability to tolerate
various environmental factors. <u>Id.</u> at *6.

assessed mental limitations in any medical opinion, [or reviewing physician], but plaintiff does not cite any authority requiring that he do so. [Tr. Doc. #12 at 25, 35; Doc. #15 at 8].  The Court agrees.  Later in this ruling, the Court will address a similar argument brought by plaintiff that the ALJ's failure to seek the "opinion of a medically acceptable source to determine whether the claimant's allegations regarding her psychiatric limitations were supported by the record . . ." was reversible error. [Doc. #12 at 31-36].

Plaintiff does not argue that the ALJ's reliance on these non-examining consultants to propound exertional limitations in the RFC is error. [Doc. #12 at 24-25]. Rather, she argues that the ALJ's failure to identify the claimant's functional limitations or restrictions and assess her work-related abilities on a function-by-function basis was error.

Social Security Ruling 96-8p describes the process for determining a claimant's RFC. "Although the Ruling requires the ALJ to assess each function associated with work at a certain exertional level to determine whether an individual can perform the full range of work at that exertional level, it provides that if no evidence is presented suggesting a limitation of that particular function, the ALJ must assume that the individual is not limited as to that functional capacity." Malloy v. Astrue, No. 3:10CV190 (MRK)(WIG), 2010 WL 7865083, at *30 (D. Conn. Nov.

17, 2010) (citing SSR 96-8, 1996 WL 374184, at *3 (July 2, 1996);
case citations omitted).  "Although a function-by-function
analysis is desirable, SSR 96-8p does not require ALJs to produce
such a detailed statement in writing."  Delgado v. Comm'r of Soc.
Sec., 30 Fed. Appx. 542, 547-48 (6th Cir. 2002) (quoting
Bencivengo v. Comm'r of Soc. Sec., 251 F.3d 153 (3d Cir. 2000));
Casino-Ortiz v. Astrue, No. 06Civ.155, 2007 WL 2745704, at *13
(S.D.N.Y. Sept. 12, 2007) (holding that although a function-by-
function analysis is desirable, SSSR 96-8p does not require a
detailed statement in writing).

     In this case, the ALJ determined that plaintiff had the RFC
to perform her past relevant work as a small parts assembler,
which is classified as light, although performed by the claimant
at the sedentary exertional level, and unskilled with a specific
vocational preparation ("SVP") of 2. [Tr. 19. Specifically, he
found that although plaintiff has diabetes, high blood pressure,
high cholesterol, obesity and complained of pain in her hands and
knee, all of these conditions are controlled and were present
when she was still working, noting "[e]verything became worse
after she lost her job, . . . collected unemployment, . . . tried
to look for a job, but could not find one." [Tr. 16-17]. With
regard to her depression, the ALJ noted that plaintiff denied
suicidal thoughts and psychotic symptoms, admitted to low energy
and difficulty concentrating, and gave conflicting reports

regarding babysitting for her grandchildren. He also noted that plaintiff lives on her own, socializes, dresses herself, manages her medication, cooks simple meals, clean and grocery shops. [Tr. 17]. He added that plaintiff reported she could walk six to seven blocks without symptoms in November 2011. [Tr. 18]. The ALJ noted that plaintiff's testimony at her hearing in May 2012, was that she could walk about two blocks, stand fifteen minutes, sit for approximately an hour before experiencing leg cramps, and lift five pounds. [Tr. 16, 35]. The ALJ stated that Dr. Kordansky found that plaintiff had good muscle tone in all four extremities, tenderness in her right knees, full range of motion in all extremities, normal reflexes and sensation and she was able to bend over and touch her toes.[12] [Tr. 17]. The ALJ took special care to note that the medical evidence of record showed that plaintiff received very conservative care, "both from a physical and mental health standpoint." [Tr. 18]. Thus, contrary to plaintiff's assertion that the ALJ made no function-by-function findings, the ALJ did make sufficient findings to support his RFC that plaintiff could perform her past relevant work as a small parts assembler, after reviewing all of the medical evidence of record. Plaintiff, who had the burden of proof at step four, provided no substantial evidence establishing

_____

[12]The doctor also noted that plaintiff did not use any assistive devices such as a cane, walker or wheelchair. [Tr. 269].

a greater degree of functional limitations. Therefore, under SSR
96-8p, the ALJ was entitled to assume that there were no other
exertional limitations.

### 5.  Obesity

Last, plaintiff argues that that ALJ failed to consider the
effect of plaintiff's obesity as required by Social Security
Ruling 02-1p.  At Step Two, the ALJ found plaintiff's obesity to
be severe, [tr. 13, finding 3], and explained that he considered
the possible effects and impact of plaintiff's obesity on her
ability to perform basic work functions. [Tr. 13]. The ALJ based
his RFC finding on opinions from medical sources who considered
plaintiff's obesity when rendering their opinion. [Tr. 53-58, 62-
70].  Substantial evidence of record supports this conclusion.
There is nothing in the medical records that suggests that her
weight impaired plaintiff's ability to do work-related
activities. At her disability examination, plaintiff weighed 190
pounds at 63 inches.  The consultative examiner Dr. Kordansky
noted she had good muscle tone in the upper and lower
extremities; present bilateral dorsalis pedis pulses; complete
range of motion in her upper and lower extremities, and normal
deep tendon reflexes;  she could touch her toes and was able to
flex her lumbosacral area approximately 160 degrees.[13]  [Tr.

---

13The doctor also noted, among other things, right knee

269]; see Drake v. Astrue, 443 Fed. Appx. 653, 657 (2d Cir. 2011) (agreeing with "District Court that the ALJ implicitly factored [claimant's] obesity and provided an overall assessment of her work-related limitations."); Francais v. Astrue, Civil No. 3:09-CV-1826 (VLB)(TSP), 2010 WL 3432839, at *4 (D. Conn. Aug. 30, 2010) ("[a]lthough the record contains some references to the plaintiff being obese, the plaintiff does not identify any documents suggesting that obesity worsened [her] other impairments or restricted [her] ability to work."). There is no medical evidence that plaintiff suffered any functional limitations as a result of her weight or that it had any impact on her ability to do work-related activities. Roth v. Astrue, No. 3:08cv436, 2008 WL 5585275, at *17 (D. Conn. Nov. 14, 2008) ("there is nothing in the record that would support a finding that this condition in any way limited Plaintiff's ability to do basic work activities, whether alone or in combination with any other impairment."); see also Rivera-Perez v. Colvin, No. 3:12-cv-00922(JCH)(HBF), slip op. doc. #25 at 52 (D. Conn. Sept. 4, 2013).

Plaintiff cites SSR 02-1p, 2002 WL 34686281 (Sept. 12. 2002), which is the Social Security Ruling on the evaluation of obesity. Under this Ruling, obesity is analyzed in the same fashion as any other impairment through the sequential evaluation

tenderness and swelling and lumbosacral tenderness. [Tr. 269].

process. The Ruling provides that there is no specific level of weight or BMI that equates with a "severe" or "not severe" impairment and, like any other impairment, obesity will be considered "not severe" if it (or a combination of slight abnormalities) has no more than a minimal effect on an individual's ability to do work activities. Here, plaintiff does not explain what evidence the ALJ failed to consider and there is not a single notation in the file that this condition interfered with plaintiff's ability to work. Accordingly, the Court finds no error on this record.

## C. Duty to Develop the Record

### 1. Mental Health Records

Plaintiff first argues that the ALJ's failure to develop the record regarding her past mental health treatment outside the period of disability was error. It is well settled that the ALJ is under an affirmative duty to adequately develop the medical record. 20 C.F.R. §416.912(d). The non-adversarial nature of a Social Security hearing requires the ALJ "to investigate the facts and develop the arguments both for and against granting benefits." Sims v. Apfel, 530 U.S. 103, 111 (2000). "An ALJ's duty to develop the record exists even where a claimant is represented by counsel." Brown v. Commissioner of Social Sec., 709 F. Supp. 2d 248, 257 (S.D.N.Y. 2010) (citations omitted). The

problem with plaintiff's argument is that the duty to develop the record extends only to the 12-month period prior to the "filing date of the claimant's application for benefits." <u>Teverbaugh v. Comm'r of Social Sec.</u>, No. Civ. A 02CV71076 D, 2002 WL 32087466, at *4 (E.D. Mich. Dec. 30, 2002); 20 C.F.R. §404.1512(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months <u>preceding</u> the month in which you file your application . . . .") (emphasis added).  Plaintiff filed her application on August 31, 2010, alleging disability as of January 1, 2010. [Tr. 145, 147]. Thus, the past mental health treatment reported by plaintiff was well outside the twelve month period.

As previously stated, Drs. Honeychurch and Rittner, the non-examining and non-treating expert opinions relied on by the ALJ, did not address plaintiff's mental health "due to the fact that the claimant did not seek treatment until April 2011- <u>after</u> these determinations were made."[14] [Tr. 19 (emphasis added)].

While intake notes from April 2011, state that plaintiff reported she had a prior psychiatric history, a one-week psychiatric hospitalization, and outpatient treatment for depression from 1998 through 2000, plaintiff also reported that she felt better and was not feeling depressed until December

---

14 Plaintiff's psychiatric intake records are dated April 28, 2011. [Tr. 334].

2010. [Tr. 334].  The fact that no records were submitted to verify plaintiff's self-report is of no matter as, according to plaintiff, her treatment was discontinued in 2000, she did not report a recurrence of symptoms until December 2010, and she did not resume treatment until April 2011.  Here, plaintiff filed her application in August 2010.  The Court finds no error in the failure to obtain these records.

### 2. Consultative Psychiatric Evaluation or Consultation

Plaintiff next argues that it was error for the defendant to fail to send plaintiff for a consultative psychiatric evaluation or psychiatric medical consultation because during her consultative medical examination with Dr. Kordansky, it was noted that she sobbed very loudly when discussing her depression. [Doc. #12 at 28; Tr. 269].  Dr. Kordansky noted that plaintiff was on "50 mg. a day" but did not specify the medication. He also noted that plaintiff "states that she is very depressed because she cannot work and because she has knee pain and heart pain which is present." [Tr. 269]. The doctor's report was dated April 1, 2011. [Tr. 268]. Ms. Perez's intake records for mental health treatment are dated April 28, 2011. [Tr. 344]. This Court finds that the ALJ's process was consistent with the SSA regulations placing the burden of proving a disability on the claimant and explicitly requiring the claimant to furnish all relevant medical evidence.

20 C.F.R. §404.1512(a), (c).

> SSA is not an HMO, and the regulations do not
> undertake to afford claimants the best available
> diagnostic services, or treatment. The burden is
> on a claimant to provide all relevant medical
> evidence, and the ALJ is to order a consultative
> exam only when this information is not
> "sufficient" to make a decision.

Firpo v. Chater, No. 95-6081, 100 F.3d. 943, 1996 WL 49258, at *2

(2d Cir. Feb. 7, 1996); ; see 20 C.F.R. §404.1517 ("If your

medical sources cannot or will not give us sufficient medical

evidence about your impairment for us to determine whether you

are disabled or blind, we may ask you to have one or more

physical or mental examinations or tests."). Plaintiff does not

argue that there were insufficient treatment records before the

ALJ to trigger a referral for a mental health consultation. Here,

the ALJ considered plaintiff's mental health treatment records

from April 28, 2011 through January 23, 2012, which was adequate

for him to make a determination on disability. [Tr. 334-38].  The

Court finds that the ALJ had no further obligation to develop the

record or to obtain a mental health consultation. Perez v.

Chater, 77 F.3d 41, 48 (2d Cir. 1996).


D.   *Credibility*

     Plaintiff next argues that the ALJ erred in assessing her

credibility . The ALJ is required to assess the credibility of

the plaintiff's subjective complaints. 20 C.F.R. §416.929.  Where

the claimant's testimony concerning pain and functional limitations is not supported by objective evidence, the ALJ retains discretion in determining the plaintiff's credibility with regard to disabling pain and other limitations.  Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999) ("The record is replete with evidence that Snell claims to experience severe and ongoing pain, even though various medical examinations have failed to discover a medical explanation for that pain.").

The courts of the Second Circuit follow a two-step process. The ALJ must first determine whether the record demonstrates that the plaintiff possesses a medically determinable impairment that could reasonably produce the alleged symptoms.  20 C.F.R. §416.929(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled."). Second, the ALJ must assess the credibility of the plaintiff's complaints regarding the intensity of the symptoms.

Here, the ALJ must first determine if objective evidence alone supports the plaintiff's complaints; if not, the ALJ must consider other factors laid out at 20 C.F.R. §416.929(c). See, e.g., Snell, 177 F.3d at 135 ("Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings."); Skillman v. Astrue, No. 08-CV-6481, 2010 WL 2541279, at *6 (W.D.N.Y. June 18, 2010).   These factors include: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) any precipitating or aggravating factors; and (4) the type, dosage, effectiveness, and side effects of any medication taken by claimant to alleviate the pain.    20 C.F.R. §416.929(c)(3)(i)-(iv); 20 C.F.R. §404.929(c)(3)(i)-(iv).  The ALJ must consider all the evidence in the case record.  SSR 96-7p, 1996 WL 374186, at *5 (Jul. 2, 1996).  Furthermore, the credibility finding "must contain specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *4.   "Even if subjective pain is unaccompanied by positive clinical findings or other objective medical evidence, it may still serve as the basis for establishing disability." Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 435 (S.D.N.Y. 2010) (citation omitted). "Put

another way, an ALJ must assess subjective evidence in light of objective medical facts and diagnoses." <u>Williams on Behalf of Williams v. Bowen</u>, 859 F.2d 255, 261 (2d Cir. 1988).

### 1. **Work Record**

Plaintiff argues that her "statements regarding the degree of pain and the limitation caused by her impairments should be deemed credible because of her 'prior work record and efforts to work.'" [Doc. #12 at 29-30, citing SSR 96-7]. She contends that her "good work record is entitled to <u>substantial credibility</u> when claiming an inability to work." [Doc. #12 at 30 (emphasis added) (citing <u>Rivera v. Schweiker</u>, 717 F.2d 719, 725, (2d Cir. 1983) (claimant with good work history entitled to "substantial credibility" when claiming inability to work); <u>but see</u> <u>Schaal v. Apfel</u>, 134 F.3d 496, 502 (2d Cir. 1998) ("SSA regulations provide that the fact-finder 'will consider all of the evidence presented including information about your prior work record.'" 20 C.F.R. §416.929(c)(3)). "[A] consideration of work history must be undertaken with great care." <u>Schaal</u>, 134 F.3d at 502. Here, the ALJ did not rely exclusively on plaintiff's work history, offering other reasons for his credibility finding grounded in the evidence. <u>Campbell v. Astrue</u>, 465 Fed. Appx. 4, at *7 (2d Cir. 2012) ("Although it is true that a good work history may be deemed probative of credibility, it remains just one of many

factors appropriately considered in assessing credibility."
(citation and internal question marks omitted)); <u>Mack v.
Astrue</u>, No. 09CV2122 (JBA)(JGM), 2011 WL 1230263, at *20 (D.
Conn. Feb. 18, 2011)("While plaintiff is correct that because she
had a good work history, she is entitled to substantial
credibility when claiming inability to work, the ALJ is entitled
to reach her conclusion after consideration of all of the entire
case record." (citations omitted)).

### 2.   Other Factors

Other factors weighed against a positive credibility finding
as to Perez's subjective assessment of the intensity of her
symptoms. The ALJ must consider all the evidence in the case
record.  SSR 96-7p, 1996 WL 374186, at *5 (Jul. 2, 1996).  Here,
the ALJ summarized plaintiff's testimony and the medical evidence
in explaining why "the record does not support the claimant's
allegations of an inability to engage in substantial gainful
activity." [Tr. 17, 16-18].

The ALJ explained,

> In sum, the records above reflect that the
> claimant has received very conservative care, both
> from a physical and mental health standpoint. She
> has had fluid drained from her knee, but she uses
> only over-the-counter analgesics and does not
> require further medical intervention.  She had one
> episode of atrial fibrillation corrected with
> medication; and since that time, her complaints of
> chest pain have been attributed to musculoskeletal

64

(and not cardiac) origins.  Her depression
responded favorable to monthly counseling and
anti-depressant medication; and she has remained
largely independent in her daily activities,
although she receives financial assistance from
her daughters. The undersigned also notes that she
collected unemployment benefits for almost two
years after her factory closed; and she
acknowledged that she could have continued to work
had she not lost her job for this reason. Her
diabetes and hypertension are controlled with
medication and there are no medically established
complications from either condition. This is not
to say that she does not have some limitations
arising from these impairments; and those
limitations reasonably established by the
objective medical evidence have been incorporated
into her residual functional capacity at finding
#5, above. These limitations do not, however,
support a finding that she is disabled.

[Tr. 18]. Each of these observations is supported by

substantial evidence.

The Court finds that the ALJ did not commit legal error by

taking account of plaintiff's work history as one factor in

assessing the credibility of her testimony regarding her

symptoms.  The ALJ correctly noted that plaintiff stopped working

due to a lay-off, after which she collected unemployment benefits

for two years. [Tr. 18].  The ALJ's notation of unemployment

benefits is an appropriate factor for the ALJ to consider in

evaluating a claimant's credibility.  Plouffe v. Astrue, No.

3:10CV1548 (CSH), 2011 WL 6010250, at *22 (D. Conn. Aug. 4, 2011)

("receipt of unemployment benefits does not preclude the receipt

of Social Security disability benefits, but rather is only one of

65

the many factors that must be considered in determining whether the claimant is disabled.")(internal citations and quotation marks omitted). Similarly, the Court finds no error that the ALJ considered plaintiff's representations that she could walk up to seven blocks (November 2011), [tr. 342], walk up to two blocks (April 2011, May 2012), [tr. 35,344], lived on the third floor, [tr. 268-69], lived on the first floor, [tr. 29, 102], would have continued to work at her past job if her employer had not moved its operation to Texas, [tr. 18, 30-31], and babysat for her grandchildren, [tr. 38]. Belica v. Astrue, No. 3:09CV1982(SRU)(WIG), 2010 WL 7865076, at *7 (D. Conn. July 30 2010) ("An ALJ must compare a claimant's statements made in connection with her claim with statements she made under other circumstances that are in the case record; statements a claimant made to treating and examining medical sources are especially important.") (citing SSR 96-7p, 1996 WL 374186, at *5). Here, Perez's good work history was one of many factors considered by the ALJ.

## E.    Treating Physician Rule

Last, plaintiff argues that the ALJ erred when he failed to give controlling weight to "the impact of plaintiff's mental impairments" offered by APRN Irene Wawrzyniak, who set forth her opinion in the Mental Illness Questionnaire dated May 14, 2012,

[tr. 351-53], and Mental Residual Functional Capacity Assessment dated June 28, 2012. [Tr. 358-62]. SSR 96-2p and 20 C.F.R. §416.927(d). There is no question that the ALJ considered plaintiff's treatment records, Mental Illness Questionnaire and Mental RFC Assessment prepared by APRN Irene Wawrzyniak. [Tr. 13-15]. Rather, plaintiff disagrees with the ALJ's disability conclusions, which the ALJ based on the mental health treatment records rather than the opinion offered by the APRN in the Mental Illness Questionnaire and Mental RFC Assessment.

Pursuant to 20 C.F.R. § 404.1527(c)(2), a treating source's opinion will usually be given more weight than a non-treating source. If it is determined that a treating source's opinion on the nature and severity of a plaintiff's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record," the opinion is given controlling weight. 20 C.F.R. § 404.1527(c)(2). If the opinion, however, is not "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques, then the opinion cannot be entitled to controlling weight.15  S.S.R. 96-2P, 1996

---

15 If the treating source's opinion is not given controlling weight, the ALJ considers the following factors: length of treatment relationship, frequency of examination, nature and extent of the treatment relationship, relevant evidence used to support the opinion, consistency of the opinion with the entire record, and the expertise and specialized knowledge of the

WL 374188, at *2 (S.S.A. Jul. 2, 1996).  "Medically acceptable"
means that the "clinical and laboratory diagnostic techniques
that the medical source uses are in accordance with the medical
standards that are generally accepted within the medical
community as the appropriate techniques to establish the
existence and severity of an impairment."  S.S.R. 96-2P, 1996 WL
374188, at *3 (S.S.A. Jul. 2, 1996).  Furthermore, "not
inconsistent" means that the opinion does not need to be
consistent with _all_ other evidence, but rather there must not be
"other substantial evidence in the case record that contradicts
or conflicts with the evidence."  Id. (emphasis added).

APRNs are not equivalent to treating physicians, and cannot
give medical opinions.  "Only acceptable sources of medical
information can provide evidence to establish a claimant's
impairment."  Malloy v. Astrue, No. 3:10CV190(MRK)(WIG), 2010 WL
7865083, at *21 (D. Conn. Nov. 17, 2010) (citing 20 C.F.R.
§§404.1513(a), 416.913(a)). "Only licensed physicians, licensed
osteopaths, licensed or certified psychologists, licensed
optometrists, licensed podiatrists, and qualified speech-language
pathologists are considered 'acceptable sources of medical
information.'"  Id.  "[N]urse practitioners and physicians'
assistants are defined as "other sources" whose opinions may be
considered with respect to the severity of the claimant's

source.  20 C.F.R. § 404.1527(c)(2)-(6).

impairment and ability to work, but need not be assigned controlling weight." Genier v. Astrue, 298 Fed. Appx, 105, 108 (2d Cir. 2008) (citing 20 C.F.R. § 416.913(d)(1)). "Therefore, while the ALJ is certainly free to consider the opinions of these "other sources" in making his overall assessment of a claimant's impairments and residual abilities, those opinions do not demand the same deference as those of a treating physician." Id. (citing Mongeur v. Heckler, 722 F.2d 1033, 1039 n. 2 (2d Cir. 1983) ("the diagnosis of a nurse practitioner should not be given the extra weight accorded a treating physician.")).

Where, as here, an Advanced Nurse Practitioner's ("APRN"), opinion is cosigned by a psychiatrist, but there are no records or other evidence to show that the psychiatrist treated Ms. Perez, the APRN's opinion does not constitute the opinion of the physician. See Vester v. Barnhart, 416 F.3d 886, 890 (8th Cir. 2005) (Finding no reason to require ALJ to credit a letter as an opinion of a "treating" psychiatrist where the counselor's letter was co-signed by psychiatrist but where there are no records or other evidence to show that the psychiatrist treated the claimant).

Here, the mental health treatment notes and opinion cited during the benefits period at issue are solely those of APRN Wawrzyniak, not a physician. Genier v. Astrue, 298 Fed. Appx, 105, 108 (2d Cir. 2008). "As such, the ALJ was free to discount

the assessments accordingly in favor of the objective findings of other medical doctors." Id. at 108-09.  On this record there was no treating physician error.

Even if the Court were to accept Perez's classification of APRN Wawrzyniak as her treating physician, the Court would nevertheless conclude that the ALJ properly weighed the medical evidence and based his decision on substantial evidence in the record.

"A psychological disorder is not necessarily disabling. There must be a showing of related functional loss." Ruiz v. Apfel, 26 F. Supp. 2d 357, 365 (D. Conn. 1998) (quoting Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986)). Plaintiff bears the burden of proof that her mental impairment prevents her from doing her past work.  For plaintiff's impairment to be considered disabling, she must demonstrate, under Listing 12.04 paragraph B, that the impairment resulted in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner; and repeated episodes of deterioration or decompensation in work or work-like settings which cause her to withdraw from the situation or to experience exacerbation of signs and symptoms. See 20 C.F.R. Pt. 404, Subpt. P. §12.04 B.

Under paragraph C,

> plaintiff must demonstrate a medically documented
> history of a chronic affective disorder of at
> least two years duration that has caused more than
> a minimal limitation of ability to do basic work
> activities, with symptoms or signs currently
> attenuated by medication or psychosocial support,
> and one of the following:
> 1. Repeated episodes of decompensation, each of
> extended duration; . . . .

See 20 C.F.R. Pt. 404, Subpt. P. §12.04 C.

Here the mental health treatment records support the ALJ's finding that plaintiff's mental impairment did not meet or medically equal the criteria of listing 12.04. [Tr. 13-14]. As discussed at length in the Court's detailed review of the mental health treatment records, there were no episodes of decompensation of extended duration and the evidence failed to establish "paragraph B" and "paragraph C" criteria. [Tr. 14]. Indeed, the treatment records show that plaintiff was receiving monthly counseling and medication management and that Ms. Perez "has not decompensated in any way, or required urgent psychiatric care of inpatient treatment."[16] [Tr. 14-15]. Plaintiff was first seen for mental health counseling in April 2011. On intake, plaintiff reported feeling increasingly depressed beginning in December 2010. Her primary care provider started her on Zoloft,

---

16 The Court notes that from April 2011 through January 2012, plaintiff attended eight appointments but was not seen in June and July 2011. [Tr. 334-38].

50 mg per day. Plaintiff reported feeling better on medication. The APRN observed a fifty-four year old Hispanic female "alert and oriented . . . [illegible], depressed and anxious mood, tearful, no suicidal or homicidal ideation, no psychotic symptoms, focus, concentration and attention good to interviewer, appetite low but patient trying to decrease weight, energy fair, sleep better with Zoloft. Low pleasure-loves time with grandchildren. Patient babysitting almost [three year old] because daughter working." [Tr. 334]. Diagnosis-Axis I: Major Depression severe without psychotic features.  [Tr. 334]. In May 2011, plaintiff brought her two granddaughters to her appointment. APRN Wawrzyniak noted that plaintiff's mood and anxiety was in fair control, appetite good, sleep better with Zoloft, with no changes to the treatment plan. There are no treatment notes for June or July 2011. [Tr. 335]. In August 2011, plaintiff returned with her two granddaughters, stating she watched them after school, she reported a good appetite, fair energy, and sleeping well with Zoloft. [Tr. 335]. In September 2011, treatment notes state that plaintiff appeared well groomed, "happy with new apartment," mood and anxiety in fair control, appetite varies, energy okay, sleep better but varies. Plaintiff stated she was looking for work. [Tr. 335-36]. In October 2011, APRN Wawrzyniak noted plaintiff's mood and anxiety to be in good control, appetite good, energy okay, sleep better. [Tr. 336]. In

treatment notes from November 2011, plaintiff's mood and anxiety were in fair control, appetite okay, energy and sleep good. [Tr. 337]. In December 2011, plaintiff presented in casual dress and well groomed. The APRN notes that plaintiff's mood and anxiety were in fair control, her appetite or energy varies, and her sleep depends on psychosocial stressors. Plaintiff's Zoloft dosage was increased to 100mg. [Tr. 337]. The last treatment record is dated January 2012, stating that plaintiff complained of no new stressors and is feeling a little calmer with the increased dosage of Zoloft. Mood and anxiety were in fair control, appetite and energy was good and sleep varies but better. [Tr. 338].  The Court finds there is substantial evidence to support the ALJ's findings on this record. Richardson v. Perales, 402 U.S. 389, 401 (1971).

**IX.  CONCLUSION**

For the reasons stated, Plaintiff's Motion for Order Reversing the Decision of the Commissioner **[Doc. #12]** is **DENIED.** Defendant's Motion for Order Affirming the Decision of the Commissioner **[Doc. #15]** is **GRANTED.**

In accordance with the Standing Order of Referral for Appeals of Social Security Administration Decisions dated September 30, 2011, the Clerk is directed to transfer this case to a District Judge for review of the Recommended Ruling and any objections thereto, and acceptance, rejection, or modification of the Recommended Ruling in whole or in part. <u>See</u> Fed. R. Civ. P. 72(b)(3) and D. Conn. Local Rule 72.1(C)(1) for Magistrate Judges.[17]

ENTERED at Bridgeport this 16th day of April 2014.

_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE

---

[17] Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of the receipt of this order. Failure to object within fourteen (14) days may preclude appellate review. <u>See</u> 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 72.2 of the Local Rules for United States Magistrates; <u>Small v. Secretary of H.H.S.</u>, 892 F.2d 15 (2d Cir. 1989)(per curiam); <u>F.D.I.C. v. Hillcrest Assoc.</u>, 66 F.3d 566, 569 (2d Cir. 1995).